UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BERNICE BROWN,

              Movant,

v.

UNITED STATES OF AMERICA,

              Respondent.

_____/

Criminal Case No. 09-20213-1
Civil Case No. 14-13949

SENIOR U.S. DISTRICT JUDGE
ARTHUR J. TARNOW

**ORDER DENYING MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE [250]; GRANTING IN PART A CERTIFICATE OF APPEALABILITY; DENYING MOTION TO APPOINT COUNSEL [255]; DENYING MOTION FOR DISCOVERY, EVIDENTIARY HEARING, AND APPOINTMENT OF COUNSEL [263]; GRANTING MOTION FOR EXTENSION OF TIME TO FILE REPLY [270]; DENYING MOTION FOR DISCLOSURE [271]; DENYING MOTION TO PROVIDE A COPY [275]; AND DENYING AS MOOT MOTION FOR STATUS REPORT [297]**

On June 22, 2010, a jury convicted Movant of nine counts of health care fraud and one count of conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1347 and 18 U.S.C. § 1349, respectively. Movant filed several post-trial motions, alleging, inter alia, that her counsel had rendered ineffective assistance. On October 22, 2010, the Court issued an Order [Dkt. #180] denying Movant's post-trial motions. On December 14, 2010, the Court sentenced Movant to roughly twelve-and-a-half years (151 months) of imprisonment. The Sixth Circuit affirmed Movant's convictions and sentence on November 5, 2012. *United States v. Brown*, No. 10-2668 (6th Cir. Nov. 5, 2012).

On August 29, 2014, Movant filed a Motion for Appointment of Counsel [255]. On October 10, 2014, Movant filed a Motion to Vacate, Set Aside, or Correct Sentence [250].  On November 21, 2014, Movant filed a Motion for Discovery, Evidentiary Hearing, and Appointment of Counsel [263].[1]  On December 12, 2014, on order of the Court, the government filed a Response [266] to Movant's motion to vacate her sentence.  On January 9, 2015, Movant filed a Motion for Disclosure [271]. On March 16, 2015, Movant filed a Motion to Provide a Copy [275],[2] as well as a Reply [276] in support of her motion to vacate her sentence.[3]  Movant filed an Amended Reply [282] on April 10, 2015.  Movant filed a Supporting Memorandum [291] on May 26, 2015.  On October 1, 2015, Movant filed a Motion for Status Report [297].

For the reasons stated below, Movant's Motion for Appointment of Counsel [255], Motion for Discovery, Evidentiary Hearing, and Appointment of Counsel [263], and Motion for Disclosure [271] are **DENIED**.  Movant's Motion to Vacate, Set Aside, or Correct Sentence [250] is **DENIED**.  Movant is **GRANTED** a

---

[1] On January 9, 2015, Movant filed a Supplemental Memorandum [269] in support of this motion.

[2] This motion requests that the Court provide Movant a copy of a filing, which Movant identifies as a motion for reconsideration of her § 2255 motion.  Movant states that the motion was "written and submitted by this court" in relation to her Motion for Discovery, Evidentiary Hearing, and Appointment of Counsel [263]. This description does not match any filing in this case.  Because the Court cannot ascertain which filing is at issue, the motion for a copy of the filing is **DENIED**.

[3] Movant previously filed a Motion for Extension of Time to File Reply [270]. That motion is **GRANTED** and Movant's Reply accepted as timely.

certificate of appealability on her argument that her constitutional right to counsel on appeal was violated, but otherwise **DENIED** a certificate of appealability.  Finally, Movant's Motion for Status Report [297] is **DENIED** as moot.

### FACTUAL BACKGROUND

Movant and her co-defendant Daniel Smorynski were convicted of carrying out Medicare fraud through Wayne County Therapeutic (WCT), of which Movant was the president and Smorynski was the vice-president.  In its Response [266], the government accurately summarized the evidence presented at trial as follows:

**1. The Physical and Occupational Therapy Contractor Scheme**
    **A. Regulatory Framework**

The government called Kelly Hartung to testify about Medicare rules for billing for physical, occupational, and psychotherapy services. Tr. 57; *see also* Gov't Tr. Exs. 1A-1F.3 She testified that Medicare pays for services provided to a Medicare beneficiary only by a person or clinic enrolled with Medicare. Tr. 63-64, 129. To enroll with Medicare as a provider of outpatient physical or occupational therapy, an occupational or physical therapist must be registered in the state. Tr. 135. Registered occupational therapists are called "OTRs" and registered physical therapists are called "RPTs." Hartung testified that if an OTR or RPT does not perform or supervise the therapy, Medicare will not pay for the services. Tr. 103, 106-107. The whole point of the system is to ensure that a licensed and enrolled Medicare provider is either performing or directly supervising the therapy provided. Tr. 136.

    **B. WCT Therapists**

During the period of the alleged conspiracy, October 2002 to September 2006, WCT employed a number of OTRs and RPTs who were enrolled with Medicare, among them Dana McDade (OTR), Desmond Rice (OTR), and Hamad Hamad (RPT). Tr. 264. McDade, Rice, and Hamad each had individual provider numbers with Medicare, under WCT's group number. Tr. 75-77. McDade and Rice both testified at trial. Tr. 260-297, 576-664. McDade and Rice explained that WCT staff assisted in processing and submitting their claims to Medicare. Tr.

266-67, 513-516. Numerous witnesses, including McDade, Marc Riley (a biller), and Tamika Taylor (Smorynski's assistant), testified that Smorynski oversaw WCT's Medicare billing operations. Tr. 405, 516, 537-38, 770-72, 817, 1057-58, 1098-99.

Hartung testified, and the supporting Medicare documents showed, that McDade, Rice, and Hamad each reassigned all of their benefits (e.g., payments) from Medicare to WCT. Tr. 74-77, 131, 267-69, 305, 584-85, 958; see also, e.g., Gov't Tr. Ex 2C. WCT submitted bills to Medicare on behalf of McDade, Rice, and Hamad electronically, and Medicare paid the claims through direct deposit into WCT's bank account. Numerous witnesses testified and documentation established that Brown controlled the WCT bank account. See, e.g., Gov't Tr. Ex. 202A; Tr. 406, 694, 733, 741-42. Therefore, payment for any "therapy" services provided by McDade, Rice, or Hamad went directly to Brown.

Although McDade, Rice, and Hamad were registered therapists, McDade, Rice, and other WCT staff testified that the three therapists actually performed very little therapy at WCT. In fact, by 2005, the three performed almost no therapy themselves. Tr. 174. McDade and Rice each testified that Brown instructed them to simply "co-sign" the files of other people who were not licensed therapists and/or who were not enrolled with Medicare. Tr. 270, 272, 308, 604-09, 750-52. WCT then billed Medicare for the therapy as if McDade, Rice, and Hamad had performed the therapy themselves. Tr. 107, 420-21, 608-10, 739-42 750.

### C. The Contractors

Beginning in October 2002, WCT contracted with three companies, Universal Rehab Services, Inc. (Universal), M&M Management, Inc. (M&M), and Lords Physical Therapy and Rehab Services, Inc. (Lords) (collectively the Contractors). Gov't Tr. Exs. 3-5. Brown signed the contracts on behalf of WCT. WCT entered into a contract with Lords in October 2002, with Universal in November 2004, and with M&M in July 2005. Tr. 165-166, 407-10, 415, 588-94. Each of the Contractors employed one physical therapist and one occupational therapist. Of the six Contractor therapists, only half were licensed, and none were enrolled with Medicare. Tr. 160-61, 588, 603-04.

The Contractors operated in similar fashion. Pradeep Pillai, as well as a number of beneficiaries, testified about how the Contractors operated. They bribed patients to sign fictitious forms, indicating they had received physical or occupational therapy and created fictitious "initial evaluations," "progress notes," and "discharge summaries" to supposedly document the therapy. Tr. 162, 173, 177, 198-99. They used

those forms to create patient charts that appeared to document therapy. Tr. 159, 162, 172-73, 213-14, 229, 239-241, 249-50.

Paul Smith, Henderson Butler, and Norris Moore, Jr. testified about receiving cash kickbacks to sign forms indicating that they had received therapy, which never occurred. Tr. 213, 239-241, 249-250; see also Tr. 175. The government introduced photographs showing M&M's owner paying cash to him for signing the fictitious forms. Tr. 218, Gov't Tr. Ex. 39.

Because none of the Contractors were enrolled with Medicare, they sold the fictitious therapy files to WCT. Pillai testified that Brown told him not to worry about not being enrolled with Medicare because she would have her staff sign the files. Tr. 159, 163-164, 194-95, 307, 523-25. Pillai testified that he was instructed not to sign any initial evaluations. Tr. 175.

### D. The Fraud

Taylor and McDade testified that when WCT received the patient files and billing paperwork from the Contractors, the patient files was sent to WCT therapists and the billing paperwork went to the billing department. Tr. 417. With respect to the patient files, McDade, Rice, and Brown herself testified that Brown instructed McDade, Rice, and Hamad to "co-sign" the files, which meant that they signed each initial evaluation, progress note, and discharge summary. Tr. 163-64, 167, 174-79, 271-72, 585-86, 596-604, 659, 798-99. Because the Contractors never signed the initial evaluations or discharge summaries, the WCT staff therapist's signature was the only one on those documents. Tr. 174-79, 279-280, 739-41, 749-51. The files made it appear to any outside observer that the WCT staff therapist (McDade, Rice, or Hamad) had performed the initial evaluation and discharge summary for the patient. *See* Gov't Tr. Exs. 9-15, 17, Tr. 174, 298, 701-02, 732, 739-41, 749-51. Typically, Brown paid McDade, Rice, and Hamad $10 per signature. Tr. 270, 304, 308, 418-421, 588, 1140. McDade and Rice both testified that they never performed any work, and that their signatures signified nothing more than the $10 payment from Brown. Tr. 276, 283-284.

Multiple witnesses testified that Brown and Smorynksi knew that Rice and Hamad only worked an hour or two every other week at WCT. *See, e.g.*, Tr. 274-275, 418-419. They had full time jobs elsewhere. Tr. 262-63, 274-75, 418-419, 448, 580, 1043. Yet they signed for 200, 500, and at times, 1000, visits in a single session, which typically lasted less than an hour, and involved doing nothing more than signing paperwork to the point where their hands hurt. Tr. 273-274, 417. Brown knew how

many files they were signing because she was paying them per signature. Tr. 275. Rice testified that he told Brown that he was uncomfortable signing evaluation and discharges for patients who he had never seen or supervised. Tr. 274, 279. Brown told him to just keep signing the files. Tr. 279.

Smorynski also knew what the therapists were doing. Tr. 275-76, 282, 304-08, 418, 449. Taylor testified that Smorynski routinely witnessed both Rice and Hamad signing large stacks of files without even reviewing the pages. Tr. 418. Rice testified that Smorynski, upon seeing him signing a stack of files, told him that he had "the easiest job in the world." Tr. 275-276. Special Agent Bartnik also testified that when he interviewed Smorynski, he admitted that WCT staff had done nothing to check to see if the therapy had been performed, let alone performed the therapy themselves. Tr. 308.

In addition to the sheer volume of visits submitted by the Contractors, the dates of service reflected in the files made it impossible for McDade, Rice, or Hamad to supervise, let alone perform, the services. That is because, in many cases, the files were so "old" that the patient had purportedly been discharged months before WCT even received the file. Tr. 618-21. McDade, Rice, and Hamad could not have performed or supervised therapy that had long since occurred. Marc Riley testified that Brown and Smorynski were aware of the staleness of the files because Medicare often imposed a 10% payment penalty on WCT for very old claims. Tr. 516, 521. Smorynski authored a memorandum about this very problem. Gov't Tr. Ex. 26.

For all the therapy visits reflected in the files that the Contractors had sold to WCT, the witnesses uniformly testified that McDade, Rice, and Hamad never met the patient, never spoke to the patient over the phone, never spoke to the contractor therapist who had supposedly provided the service about the patient, and had no idea if the therapy had been performed at all. Tr. 174, 179, 216, 241-242, 278, 282-283, 577. WCT therapists did not perform the services or supervise the services reflected in the Contractors' files. Tr. 167, 175-176, 178, 180, 217-218, 241-242, 250, 283.

Meanwhile, the billing paperwork was sent to WCT's billing department, where it was used to submit claims to Medicare. Tr. 511-22. At the direction of Brown and under the guidance of Smorynski, the claims were submitted, under the provider numbers of McDade, Rice, and Hamad. Tr. 302-03, 511-22, 527, 608-10, 739-42. By causing the claims to be submitted to Medicare, Defendants represented that

McDade, Rice, and Hamad had performed the services or supervised the services, when they knew that that was not true. Tr. 107, 750.

**E. The Money**

WCT billed Medicare for over $24 million for the Contractor files, and Medicare paid over $6 million into the WCT account, which was controlled by Brown. Tr. 694, 713-16, 733, 741-42. Given that WCT did almost nothing to gain this money, its profit margins were huge. Gov't Tr. Ex. 55. Brown rewarded herself, her family, and Smorynski accordingly. From June 2003 to June 2006, Brown paid herself in excess of $2 million, and paid two of her children, Ebony and Darnell Brown, over $1 million. Gov't Tr. Ex. 67. Smorynski made over $500,000 during that period. Tr. 303. During the height of the fraud, Bernice Brown, Ebony Brown, Darnell Brown, and Smoynski were the highest compensated people at WCT. Neither Ebony nor Darnell Brown did any substantive work for WCT during that period. Tr. 410-13.

Brown also tried to hide her money. Jacques Graves, a teller from Citizens Bank, testified, with supporting documentation, that at approximately 9:00 a.m. on September 13, 2006 (moments after law enforcement began executing a search warrant at WCT), Brown tried to transfer her entire account, almost $200,000, to her son's account. Gov't Tr. Ex. 204. Graves testified that Brown had never sought to empty her account before.

**2. The Social Work Scheme**

Taylor, Renee Watson, and Riley testified that Brown restructured the entire WCT staff to begin performing psychotherapy or, as she termed it, "social work" for WCT patients after Medicare imposed a cap on physical and occupational therapy reimbursements in January 2006. Tr. 330-31, 356, 425-427, 529-30, 625-26, 719-20. Numerous internal WCT documents—many either handwritten or initialed by Brown herself—corroborated their testimony. *See, e.g.*, Gov't Tr. Exs. 102-111. For a short time, WCT was forced to lay off some of its staff members and cut the salaries of several others. Tr. 303, 425. Brown had authorized a contemporaneous memorandum warning, "All jobs were on the line because of the cap." Tr. 1070.

Taylor, Watson, and Riley testified that Brown told her staff that WCT's current physical and occupational therapy clients must be "depressed" because they were not receiving as much therapy due to the cap. Tr. 334-35, 357-58, 367. The witnesses testified that Smorynski drafted petitions for the patients to sign, demanding repeal of the cap,

and drafted letters to Congress, purportedly on behalf of the patients, also demanding repeal of the cap. Tr. 335, 339, 342-43, 429, 432-35. Smorynski also drafted a script that WCT staff was supposed to read to patients over the phone regarding the cap, WCT's lobbying effort, and the fact that WCT would bill Medicare for its lobbying efforts. Tr. 335-40, 343-46, 350, 354, 427-30, 432-34, 460, 532-35.

Taylor, Watson, and Riley testified that, at a meeting on February 13, 2006, Brown gave specific instructions to her staff on how to bill for their new work. Tr. 435. She distributed a memorandum and a sample billing sheet with precise instructions. Gov't Tr. Exs. 103C-D; Tr. 350-351, 437. All patients were to be diagnosed with "depression." Tr. 350-54, 357-39, 367, 437-38, 442, 531-32. Brown wrote that "the only billable code for social work is 311 for depression." Gov't Tr. Exs. 103C-D. Brown instructed the WCT staff that the initial telephone call, during which they were instructed to read from the script prepared by Smorynski, was to be billed using a code 90801, which stood for individual psychotherapy evaluation. Tr. 350-54, 357-59, 361-62, 367, 389, 437-430, 460, 532-35. All subsequent phone calls, time spent writing the letters to Congress, and other time spent on the process, should by billed using a code 90806, which signified a 45-50 minute face-to-face psychotherapy session with the client. Tr. 350-354, 361-62, 437-40. But rather than face-to-face meetings, Brown instructed her staff to make only phone calls, and that "permission" from management was required to see a patient. Tr. 345-46, 349-353, 440.

The persons Brown selected to actually perform the social work "evaluations" and "meetings" were a motley collection of billers, drivers, unlicensed and licensed occupational therapists, and administrative assistants. Tr. 430. Brown told those "social workers" that they were to create notes, but that the one licensed social worker on staff, Joanne Smith-Washington, would "co-sign" their notes. Tr. 348-49, 359-63, 367-68, 440-441, 445-46, 756-57. Smith-Washington did not meet with or speak to the patients, or the persons supposedly performing the "therapy." Tr. 349, 359-360, 363, 365, 398. Smith-Washington also did not supervise the persons supposedly performing "therapy." Tr. 360. Watson testified that Brown informed her to leave the signature on the initial evaluation, which she had prepared, blank, so Smith-Washington could sign it, because otherwise Medicare would not pay. Tr. 360, 363. Brown directed Smith-Washington to sign all of the patient notes—making it look like Smith-Washington had performed the social work services. Tr. 348-49, 359-63, 367-68, 440-41, 445-46, 756-57. All of the

reimbursements from Medicare were paid into the WCT bank account, which Brown controlled. Tr. 756.4

Rita Perry and Bettye Everson, two Medicare beneficiaries, testified that they never received the services billed by WCT to Medicare on their behalf. Tr. 396-401, 487-494. Medicare actually sent a letter to Smorynski demanding an accounting. Tr. 759-62, 1057. But rather than come clean, Brown and Smorynski, knowing that Perry never received any therapy, submitted false paperwork to Medicare and actually "re-billed" Medicare for services supposedly provided to her. Tr. 759-62. Defendants' own witness, Melyssa Byrd, admitted on cross-examination that she had no idea that WCT had billed Medicare for psychotherapy, and denied ever receiving such services from WCT. Tr. 856. Yet WCT billed Medicare fifteen times for psychotherapy "treatments" and maintained a false file to document such services. Gov't Tr. Exs. 119-121.

## REQUESTS FOR APPOINTMENT OF COUNSEL

Movant has requested the appointment of counsel in her Motion for Appointment of Counsel [255], her Motion for Discovery, Evidentiary Hearing, and Appointment of Counsel [263], and her Supplemental Memorandum [269] in support of the latter. Movant points out that if an evidentiary hearing were warranted, the Court would be required to appoint counsel to represent her at the hearing. Rules Governing § 2255 Proceedings, Rule 8(c), 28 U.S.C.A. foll. § 2255. As explained below, however, an evidentiary hearing is not warranted. It is true that the Court has discretion to appoint counsel to represent a financially eligible § 2255 movant where the interests of justice so require. 28 U.S.C. § 2255(g); 18 U.S.C. § 3006A(2)(B). Movant has not convinced the Court, however, that the interests of justice require the

appointment of counsel.  Accordingly, Movant's requests for appointment of counsel are **DENIED**.

### REQUESTS FOR DISCOVERY AND EVIDENTIARY HEARING

Movant requests discovery and/or an evidentiary hearing in her Motion for Discovery, Evidentiary Hearing, and Appointment of Counsel [263], in her Supplemental Memorandum [269] in support thereof, and in her Motion for Disclosure [271].  The Court may authorize a party to conduct discovery in support of a motion under 28 U.S.C. § 2255 for "good cause."  Rules Governing § 2255 Proceedings, Rule 6, 28 U.S.C.A. foll. § 2255.  The good cause requirement bars "fishing expeditions based on a petitioner's conclusory allegations."  *Cornwell v. Bradshaw*, 559 F.3d 398, 410 (6th Cir. 2009) (quoting *Williams v. Bagley*, 380 F.3d 932, 974 (6th Cir. 2004)).  The movant must "present[] specific allegations showing reason to believe that the facts, if fully developed, may lead the district court to believe that federal habeas relief is appropriate."  *Id.* (quoting *Lott v. Coyle*, 261 F.3d 594, 602 (6th Cir. 2001)).

Movant's Motion for Discovery, Evidentiary Hearing, and Appointment of Counsel requests discovery and mentions "new evidence" to be presented at an evidentiary hearing, but does not describe any evidence Movant hopes to discover.  In her Motion for Disclosure, Movant requests discovery of all "immunity agreements, special deals, agreements not to prosecute, named and unnamed parties, and proffers

… to include any plea deals whether accepted or not." The motion makes clear that Movant seeks such evidence not only concerning the parties to this case, but also concerning the parties in a related case before the Honorable Sean F. Cox. Movant presents no argument whatsoever in support of these discovery requests. She has therefore failed to carry her burden of presenting specific allegations showing reason to believe the requested discovery may lead the Court to believe that relief is appropriate.

Movant's Supplemental Memorandum cites several cases in which the Sixth Circuit found an evidentiary hearing necessary in habeas corpus or § 2255 proceedings. However, the need for an evidentiary hearing must be assessed in light of the factual issues (or lack thereof) presented in each case. For the reasons explained below, "the files and records of the case conclusively show that [Movant] is not entitled to relief." *Ross v. United States*, 339 F.3d 483, 490 (6th Cir. 2003). The Court therefore need not hold an evidentiary hearing. *Id.*

### MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE

To succeed on a motion to vacate, set aside, or correct sentence, a movant must allege "(1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law that was so fundamental as to render the entire proceeding invalid." *Pough v. United States*, 442 F.3d 959, 964 (6th Cir. 2006) (quoting *Mallett v. United States*, 334 F.3d 491, 496-97 (6th Cir. 2003)). Movant

alleges two errors of constitutional magnitude: a violation of her Sixth Amendment right to the effective assistance of counsel, and a violation of her right, derived from principles of equal protection and due process, to counsel on appeal. However, she fails to make a sufficient showing of either violation.

## I.      Ineffective assistance of counsel

Movant alleges a violation of her Sixth Amendment right to the effective assistance of counsel. To establish ineffective assistance of counsel, Movant must show that her counsel rendered deficient performance and thereby prejudiced Movant's defense so as to render the outcome of the proceedings unreliable. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). Movant raises many challenges to her counsel's performance. None, however, meet the *Strickland* standard.

### A.      Failure to advance Movant's interpretation of Medicare regulations

Many of Movant's challenges to her counsel's performance center on counsel's failure to advance Movant's interpretation of Medicare regulations.[4] As Movant interprets the regulations, they permitted WCT to bill Medicare for therapy not personally performed or directly supervised by its therapists. On direct appeal, however, the Sixth Circuit rejected Movant's interpretation, stating explicitly that "the

---

[4] For instance, Movant faults her counsel for failing to move to dismiss the indictment on the grounds that it was premised on an erroneous interpretation of the regulations; for failing to retain her Medicare compliance attorney to testify that WCT complied with the regulations; and for failing to object to jury instructions that allegedly misrepresented the regulations.

regulations required WCT's registered therapists to perform or directly supervise therapy that was billed to Medicare."  Accordingly, the Sixth Circuit held that evidence that Movant "knew that WCT's therapists did not provide any services or supervision regarding some of the billings" and instead "merely signed the files that were prepared by other contractors" sufficed to support her Medicare fraud convictions.

Movant's counsel did not render deficient performance or prejudice Movant's defense by failing to advance an interpretation of Medicare regulations rejected by the Sixth Circuit.

### B.    Failure to file motion for severance

Multiple charges against the same defendant may be tried together if the charged offenses are of "similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan."  *United States v. Medlock*, 792 F.3d 700, 711 (6th Cir. 2015) (quoting FED. R. CRIM. P. 8(a)). Charges against multiple defendants may be tried together if the defendants "are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses."  *Id.* (quoting FED. R. CRIM. P. 8(a)).  "Under Rule 8(b), defendants who are indicted together, ordinarily should be tried together."  *United States v. Gardiner*, 463 F.3d 445, 472 (6th Cir. 2006) (quoting *United States v. Breinig*, 70 F.3d 850, 852 (6th Cir. 1995)) (internal quotation marks

and brackets omitted).  A defendant moving to sever his trial from that of a co-defendant "must show compelling, specific, and actual prejudice from a court's refusal to grant the motion to sever."  *Id.* (quoting *United States v. Saadey*, 393 F.3d 669, 678 (6th Cir. 2005)).  The mere fact that the government has stronger evidence against the co-defendant than against the moving defendant, or that the moving defendant would have a greater chance of acquittal if tried separately, does not establish sufficient prejudice.  *Id.* (citing *United States v. Warner*, 971 F.2d 1189, 1196 (6th Cir. 1992)).

Movant faults her counsel for failing to move to sever her trial from co-defendant Smorynski's trial.  However, Movant and co-defendant Smorynski were properly tried together because they were accused of participating in the same fraudulent scheme, through the same company, in the same time period.  Movant also faults her counsel for failing to move to sever the charges concerning fraudulent billing for occupational and physical therapy from the charges concerning fraudulent billing for psychotherapy.  The offenses underlying these charges, however, were properly tried together because they constituted parts of a common scheme or plan.  Moreover, Movant has failed to explain how her counsel could have convinced the Court that failing to grant a motion for severance would result in compelling, specific, and actual prejudice.  Thus, Movant was not prejudiced by her counsel's failure to file a motion for severance.

**C.      Failure to more thoroughly consult with Movant before trial**

Movant faults her counsel for failing to consult with her more thoroughly
before trial.  The Court has rejected this argument before.  In her post-trial motion for
a new trial, Movant conceded that counsel met with her three or four times before
trial, for several hours each time.  She argued that these consultations were
insufficient only because counsel did not review certain documents with Movant or
use them at trial.  The Court rejected the argument when it denied Movant's motion
for a new trial.  Movant's instant motion does not persuade the Court that it erred.

**D.      Failure to inform Movant of the basis of the charges against her**

Movant faults her counsel for failing to sufficiently inform her of the
government's case against her.  Specifically, Movant faults counsel for failing to
inform her of the contents of government exhibits and the expected testimony of
government witnesses.

This argument fails.  On direct appeal, Movant argued that her Sixth
Amendment rights were violated because she lacked notice of what "was being
charged, including, what evidence, witnesses, and what the witnesses were going to
testify to in court."  The Sixth Circuit found this "undeveloped" argument
unpersuasive because Movant "was properly charged by indictment" and there was
"no indication that the prosecution withheld evidence from her."  As the Sixth Circuit
concluded, Movant appeared to have sufficient notice of the case against her.

Moreover, Movant has not explained how she would have mounted a stronger defense if her counsel had provided her with any more detailed information on the government's case. Movant has therefore failed to show that her counsel's discussion with her regarding the basis of the charges constituted deficient performance or prejudiced her defense.

### E. Failure to object to government appeals to the passion of the jury

During his rebuttal to the defendants' response to his closing arguments, government counsel said the following:

> Now, when I asked Ms. Brown yesterday about licensing requirements, you remember the answer that she gave. She couldn't give an answer as to why someone would get a license. She testified you don't need a license to do anything with the state.
> Come on, ladies and gentlemen. You think the state has its complicated licensing rules for no reason? You think therapists go out and get their license for no reason? Would you want -- if you had like a hip problem and you wanted a therapist to help you with that, do you want someone -- doing electric treatments on you, do you want someone who is not even licensed in the state?
> She mentioned, well, [the WCT contractors] have a Bachelor's Degree.
> The contractors in the state had Bachelor's Degrees. They were from India and Pakistan. Do you want someone who has no verification that they have any sort of basic skills from this country performing therapy on you?

Movant argues that government counsel improperly appealed to the passion of the jury by referencing electric treatments provided by unlicensed therapists, as well as by referencing India and Pakistan. She further argues that her counsel's failure to object to these improper appeals constituted ineffective assistance.

16 of 22

Even assuming that counsel's failure to object to these statements constituted deficient performance rather than a reasonable strategic decision, Movant cannot show prejudice.  The Court instructed the jury that government counsel's statements were not evidence.  "The prosecutor's statements were not so extreme that the instructions given could not cure any prejudice that may have resulted."  *Hale v. Burt*, --- F. App'x ---, 2016 WL 1445368, at *7 (6th Cir. 2016) (citing *Johnson v. Bell*, 525 F.3d 466, 484–85 (6th Cir. 2008)).

### F.    Gaps in representation

On July 5, 2010, Movant filed a Motion for Judgment of Acquittal [100] and Motion for New Trial [101] through attorney Fred Walker.  On July 16, 2010, Movant filed a Motion to Terminate Fred Walker's Representation [113].  On July 27, 2010, Movant filed a pro se Superseding Motion for Judgment of Acquittal [127].  On August 3, 2010, she filed a Motion for Arrest Warrants [130] and a Superseding Motion for New Trial [132].  On August 13, 2010, the Court issued an Order [154] allowing Fred Walker to withdraw from representing Movant.  On August 25, 2010, attorney Lloyd Johnson filed an appearance on Movant's behalf.  Attorney Johnson died on September 20, 2010.  On October 20, 2010, the Court held a hearing on Movant's superseding post-trial motions.  During the hearing, Movant requested that the Court postpone decision on the motions until she was represented by new counsel.

The Court declined to postpone decision, issuing an Order [180] denying the motions two days later.

Movant argues that her right to counsel was violated by gaps in representation—between Walker's withdrawal and Johnson's appearance, as well as following Johnson's death—leading up to the Court's denial of her post-trial motions. On direct appeal, however, the Sixth Circuit expressly held that Movant did not show she was prejudiced by the absence of counsel at the hearing on her post-trial motions. Movant may not relitigate this issue.

### G.   Failure to move for an evidentiary hearing on victims' loss

The Court sentenced Movant and her co-defendant Smorynski to pay restitution in the amount of $6,721,272.30, to compensate the Medicare Trust Fund's loss of $6,659,551.34 and Blue Cross Blue Shield's loss of $61,720.96. Movant faults her counsel for failing to move for an evidentiary hearing on the amount of loss suffered by each victim.

This argument fails. On direct appeal, the Sixth Circuit rejected co-defendant Smorynski's argument that the Court erred by failing to hold an evidentiary hearing before sentencing, stating as follows:

> [Smorynski] now argues that he was entitled to an evidentiary hearing before sentencing and that the district court erred in calculating the amount of loss that was attributed to him. However, the court was already aware of the evidence regarding the amount of loss because it had presided over Brown's trial. The evidence at trial indicated that WCT submitted over $18,000,000 in fraudulent claims to Medicare,

even if the amount of co-pays was excluded. As a result, the court properly increased Smorynski's offense level by twenty levels because the intended loss exceeded $7,000,000. *See* USSG § 2B1.1(b)(1)(K); *United States v. Gale*, 468 F.3d 929, 935 (6th Cir. 2006); *United States v. Sosebee*, 419 F.3d 451, 456 (6th Cir. 2005).

Movant does not identify any grounds for an evidentiary hearing that were not advanced by her co-defendant and rejected by the Sixth Circuit. Indeed, Movant does not even attempt to identify any error in the loss calculation. Movant thus fails to show any likelihood that holding an evidentiary hearing would have changed the outcome of the sentencing proceedings.

### H.   Conclusion on ineffective assistance of counsel

Movant has failed to make a substantial showing of a denial of her constitutional right to the effective assistance of counsel. Accordingly, Movant's ineffective assistance of counsel argument is denied, and she is denied a certificate of appealability on the issue.

## II.   Violation of constitutional right to counsel on appeal

Indigent criminal defendants generally have a right, derived from the Constitution's equal protection and due process guarantees, to counsel on a first appeal. *Smith v. Robbins*, 528 U.S. 259, 276–78 (2000). "[A]n indigent defendant's … right to counsel on appeal will not be deemed waived even in the absence of a request for appointment of appellate counsel." *United States v. Aloi*, 9 F.3d 438, 444

(6th Cir. 1993) (citing *Swenson v. Bosler*, 386 U.S. 258, 260 (1967)).  A non-indigent

defendant does not have this right.  *Id.*

On March 26, 2010, the Court permitted Movant's retained counsel to

withdraw, and Movant informed the Court that she did not have funds to retain a new

attorney.  The Court subsequently appointed counsel to represent Movant.  Movant

was represented by appointed counsel until the Court permitted attorney Fred Walker

to withdraw on August 13, 2010 (after Movant had been convicted).  Movant

subsequently retained attorney Lloyd Johnson, who died shortly thereafter.  Movant

retained attorney Dionne Webster-Cox to represent her in sentencing proceedings.

After Movant was sentenced and judgment was entered, Webster-Cox filed an

appeal on Movant's behalf on December 21, 2010.  On March 28, 2011, Webster-Cox

filed, in the Sixth Circuit, a motion to withdraw as appellate counsel.  The motion

explained only that Webster-Cox's "services were terminated."  The Sixth Circuit

granted this motion on March 29, 2011, directing Movant to file a status report

advising the court if she intended to retain new counsel or represent herself on appeal.

Movant sent a written response advising the Sixth Circuit that she would proceed pro

se until she was "able to select another attorney or be granted a Court Appointed

Attorney."  On April 25, 2011, the Sixth Circuit sent Movant a letter advising her that

the court had reviewed her status report, enclosing a form for submission of a pro se

brief.  Movant proceeded to represent herself on appeal.  Movant now argues that her right to counsel on appeal was violated.

As evidenced by the fact that Movant retained counsel and informed the Sixth Circuit that she would represent herself until she was able to "select" another attorney, Movant was not indigent in the sense of lacking funds to retain counsel.  She therefore had no right to counsel on appeal that could not be waived by her election to proceed without counsel.

While the Court concludes that there was no violation of Movant's right to counsel on appeal, it further concludes that Movant has made a sufficiently substantial showing to warrant a certificate of appealability on this issue only.  In any event, the Sixth Circuit may be better positioned to evaluate the constitutional soundness of its own proceedings.

## CONCLUSION

For the reasons stated above,

**IT IS ORDERED** that Movant's Motion for Appointment of Counsel [255], Motion for Discovery, Evidentiary Hearing, and Appointment of Counsel [263], Motion for Disclosure [271], and Motion to Provide a Copy [275] are **DENIED**.

**IT IS FURTHER ORDERED** that Movant's Motion for Extension of Time to File Reply [270] is **GRANTED**.  Movant's Reply is accepted as timely.

21 of 22

**IT IS FURTHER ORDERED** that Movant's Motion to Vacate, Set Aside, or Correct Sentence [250] is **DENIED**.  Movant is **GRANTED** a certificate of appealability on her argument that her constitutional right to counsel on appeal was violated, but otherwise **DENIED** a certificate of appealability.

**IT IS FURTHER ORDERED** that Movant's Motion for Status Report [297] is **DENIED** as moot.

**SO ORDERED**.

s/Arthur J. Tarnow
Arthur J. Tarnow
Dated: May 25, 2016                    Senior United States District Judge

22 of 22